**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| WILMINGTON PLANTATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:10 C 01218 |
| | ) | Judge Marvin E. Aspen |
| FIDELITY NATIONAL TITLE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment filed by Defendant Fidelity National Title Insurance Company ("Fidelity"). The dispute arises from Plaintiff Wilmington Plantation, LLC's ("Wilmington") purchase of 19.846 acres of property known as Wilmington Plantation ("the Property"). The parties agree that the Property was to be developed into a maximum of 265 condominium units, including common elements. (Def. SOF ¶ 6.) Wilmington secured title insurance on the Property through Fidelity and asserts that, as a result of the title search conducted by Fidelity's agent, it bought the property thinking it would be conveyed in fee simple. (Compl. ¶¶ 12, 21.) However, use of the property was significantly restricted by a declaration of condominium, and 24 condominium units on the Property had previously been sold in fee simple to third parties. (*Id.* ¶¶ 15, 30.) Based on these alleged defects in title, Wilmington sought to recover the purchase price from Fidelity, claiming damages under the title

insurance policy. (*Id.* ¶ 16.) Fidelity denied coverage based on its belief that the type of damages alleged are not covered under the title policy. (*Id.* ¶ 17.)

Wilmington filed this action alleging that Fidelity's denial of coverage constitutes a breach of contract; it also asserts an equitable estoppel cause of action. (Compl. ¶¶ 31, 38.) Fidelity has moved for summary judgment, arguing that Schedule B of the title insurance policy expressly excepts from coverage any loss or damage from the declaration that created the Property as an expandable condominium and from all units, rights, interests and common ground previously conveyed pursuant to the declaration. (Mot. at 2.) Wilmington, on the other hand, claims that these exceptions are materially different from those included in the title commitment presented to, and relied upon by Wilmington prior to closing. (Compl. ¶ 22.) For the reasons set forth below, we grant Fidelity's motion.

**BACKGROUND**

**1. The Declaration**

In December 2002, William Foster, the previous owner of the Property, subjected the Property to a Declaration of Condominium ("Declaration"). The Declaration was recorded in the Chatham County, Georgia Superior Court and expressly submitted the Property to the provisions of the Georgia Condominium Act, O.C.G.A. §§ 44-3-70, *et seq*. (Def. SOF ¶¶ 4–5.) The Declaration described the property submitted as the same 19.846 acres comprising the Property eventually purchased by Wilmington. (Def. SOF ¶ 6.) The Declaration declared that it constitutes a covenant running with the land, binding upon the owner and any subsequent successors and all subsequent owners of any part of the property or improvements. (Def. SOF ¶ 7.)

The Declaration defined "common elements" as being "all portions of the Condominium other than the Units, and shall include the common areas and facilities as defined in the Georgia Condominium Act, the Declaration, Association by-laws, and amendments to such." (Def. SOF ¶ 9.) The common elements were expressly not deemed to be a part of each unit. (*Id.* ¶ 10.) The Declaration further provided that "portions of additional property may be added to the Condominium at different times and in such amounts as shall be determined by the Owner without limitation." (Declaration at 27.) However, while "Additional Property" was defined as the property described in Exhibit A and designated "reserved for future development," Exhibit A did not list any property as "reserved for future development." (Declaration at 3, Ex. A.)

Also in December 2002, a Condominium Plat was recorded in Condominium Book 2, Page 12 of the Chatham County, Savannah, Georgia records; the Plat covered the same 19.846 acres purchased by Wilmington. (Def. SOF ¶ 13.) The Plat showed nine pads for "proposed" buildings. (2002 Plat.) It also delineated that all areas not covered by buildings were to be common for use of parking access and utilities. (Def. SOF ¶ 13.)

**2. Transfer of the Property**

In August 2004, Wilmington entered into a real estate purchase agreement with Foster ("Purchase and Sale Agreement"). (Pl. SOF ¶¶ 1–2.) The Purchase and Sale Agreement states:

> Seller hereby agrees to sell and convey to Buyer . . . the following:
>
> (a) All that certain lot, tract or parcel of real estate, lying and being in Chatham County, 700 Wilmington Island Road, Savannah, Georgia, and as more particularly described in Exhibit "A" attached hereto, consisting of nine (9) condominium pad sites for a two hundred twenty unit (220) expansion of Wilmington Plantation, a horizontal property regime . . . including, without limitation, all of Seller's rights, title and interest in and to the land underlying . . . and

> (c) All of Seller's right, title and interest in and to the 20 +/- acre parcel as described in survey recorded in Plat Book 2 at Page 12, Chatham County, Savannah, Georgia.

(Purchase and Sale Agreement at 3–4.) It continues:

> Seller covenants to convey to Buyer at Closing good and marketable fee simple title in and to the Property. For the purposes of this Agreement, 'good and marketable fee simple title' shall mean fee simple ownership which is (i) free of all claims, liens and encumbrancers of any kind or nature whatsoever other than the Permitted Exceptions, herein defined . . . [f]or the purposes of this Agreement, the term 'Permitted Exception' shall mean: (A) . . . taxes not yet due and payable; (B) easements for the installation or maintenance of public utilities serving only the Property; and (C) any other matters specified on Exhibit 'F' attached hereto.

(*Id*. at 6.) Exhibit F defines "Permitted Exceptions" to include "Any liens, encumbrances, restrictions or easements recorded in the public records of Chatham County, Georgia, provided that any liens or encumbrances to secure monetary amounts owed by Seller shall be satisfied at Closing." (*Id.* at 21.)

On August 2, 2005, Foster executed two additional documents to assign to Wilmington all his rights, title and interest in the Property, including all developer rights in the Property and the nine pads sites. He executed a quit claim deed assigning his interest in the Property to Wilmington for the express purpose of releasing the Property from a prior security deed from Foster to Empire Financial Services. (Def. SOF ¶¶ 21–22.) He also executed a Warranty Deed which included a description of the property and indicated "[s]pecifically included and contained within this legal description are nine (9) condominium pad sites, which allow for a two hundred twenty (220) unit expansion." The Warranty Deed both explains that it is "given subject to all easements and restrictions of record" and states that the parcel is "behoof[ed] to the said Grantee in FEE SIMPLE." (Warranty Deed at 1–2.)

### 3. Suit by Unit Owners

In February 2005, third parties brought an action to quiet title against Foster. According to Wilmington, the action was brought by individual unit owners who alleged that the entire Property was either (1) condominium units already conveyed in fee simple to valid purchasers, or (2) common area for the use and enjoyment of all unit owners. (Pl. SOF ¶ 18.) Fidelity disputes this characterization of the allegations. (Def. Resp. to Pl. SOF ¶ 18.) On August 2, 2005, prior to Wilmington closing on the Property, Foster assigned his rights in the action to Wilmington. (Def. SOF ¶¶ 17–18.) In November 2005, after Wilmington closed on the Property, it was named a defendant in the action.

As a result of this litigation, Wilmington and the condominium unit owners entered into a Consent Order to reform the Declaration by designating the nine pad sites as additional property reserved for future development. (Pl. SOF ¶ 20.) As part of the Consent Order, Wilmington acknowledged that it held title to the pad sites as described in the now amended Declaration. (Def. SOF ¶ 30.) Wilmington alleges that these changes were made in an effort to mitigate its damages and asserts that it incurred over two million dollars in legal fees as a result. (Pl. SOF ¶ 20.)

### 4. Title Policy Documents

As an incident to the purchase of the Property, Wilmington purchased an Owner's Policy of Title Insurance ("Title Policy") from Fidelity. (Pl. SOF ¶ 8.) "A contract of title insurance is an agreement whereby the insurer, for a valuable consideration, agrees to indemnify the assured in a specified amount against loss through defects of title to real estate, wherein the latter has an interest, either as purchaser or otherwise." *Glass v. Stewart Title Guaranty Co.*, 354 S.E.2d 187,

189 (Ga. App. 1987) (citing *Beaullieu v. Atlanta Title etc., Co.*, 4 S.E.2d 78, 78 (1939); OCGA § 33-7-8)).

J. Scott Vaughan, an attorney practicing in Chatham County, acted as the issuing title agent for Fidelity in the issuance of the Title Policy. (Vaughan Aff. ¶ 1.) Vaughan's duties included conducting the title search of the Property and preparing the closing documents. (Pl. SOF ¶ 6.) Vaughan had previously provided legal services to Foster and had closed prior fee simple ownership transfers of condominium units within the Property. (*Id*. ¶ 7.) Wilmington designated its Chief Manager, Kenneth Kraft, to execute the closing documents on its behalf. (*Id*. ¶ 9.) Wilmington asserts that Kraft was never informed that Wilmington's ownership interest in the Property would be less than fee simple and never believed that its interest would be less than fee simple. (*Id*. ¶ 10.)[1] Various documents related to the Title Policy were allegedly sent by Fidelity or its agents to Wilmington or its agents. As to each of the following documents, the parties dispute either the significance of the language or when and if the document was sent.

(1) ***July 26, 2005 Title Commitment***. An original Title Commitment for Title Insurance was sent to Wilmington on July 26, 2005 ("July 26 Title Commitment"). (Def. SOF ¶ 19 (citing Vaughan Aff. ¶ 2).) Schedule B-II of this commitment lists as an exception to coverage "Protective Covenants recorded in Deed Book 243-V, Page 688." (July 26 Title Commitment at 6.)

---

[1] Fidelity, in response, does not indicate that it directly informed Kraft about the type of title, but instead explains that "Wilmington purchased whatever interest in the Property that was sold to it and provided to it in the quit claim deed and Warranty Deed, which expressly excepted from title all easements and restrictions of record, including the Declaration, as amended." (Def. Resp. to SOF ¶ 10.)

(2) ***July 27, 2005 Revised Title Commitment.*** Fidelity asserts that a revised title commitment was sent to Wilmington on July 27, 2005 ("Revised Title Commitment"). (Def. SOF ¶ 20 (citing Vaughan Aff. ¶ 3).) Schedule B of the Revised Title Commitment lists as an exception to coverage "the Declaration, as supplemented and amended . . . and, all units, rights, interest and common grounds previously conveyed pursuant to the Declaration." (Revised Title Commitment at 6.) Wilmington denies receipt of the Revised Title Commitment. (Pl. Resp. to Def. SOF ¶ 20.)

(3) ***Closing Documents.*** On August 2, 2005, Wilmington executed a Deed to Secure Debt, a Security Agreement, and an Assignment of Leases and Rents in favor of AmSouth Bank. Fidelity asserts that Exhibit B of the Deed expressly acknowledged that both the Declaration and all units, rights, interests and common grounds previously conveyed pursuant to the Declaration were "Permitted Title Exceptions" to the fee simple title held by Wilmington and secured by AmSouth. (Def. SOF ¶ 24.) However, Wilmington denies this statement and explains that Kraft, who executed the document, does not believe Exhibit B was attached to the documents at execution. In support, Wilmington emphasizes that each page of the document bears a time and date stamp, except for Exhibit B. (Pl. Resp. to Def. SOF ¶ 24.)

(4) ***August 3, 2005 Marked-Up Title Commitment.*** On August 3, 2005, Fidelity sent a final "Marked-up" title commitment to Wilmington. (Def. SOF ¶ 25.) The document lists as exceptions to coverage the Declaration and all units, rights, interests, and common grounds previously conveyed pursuant to the Declaration. (*Id.*) Wilmington agrees that this document was received on August 3, 2005, but indicates that it was faxed at 11:15 a.m., after the closing was completed and funds were wired. (Pl. Resp. to Def. SOF ¶ 25.)

(5) ***Owner's Policy of Title Insurance.*** Fidelity insists that Wilmington received the Policy, insuring its fee simple interest in the Property subject to the exceptions, on August 3, 2005. (Def. SOF ¶ 26 (citing Vaughan Aff. ¶ 5).) Wilmington asserts that the policy was not sent until on or after September 15, 2005. (Pl. Resp. to Def. SOF ¶ 26 (citing Kraft Aff. ¶ 12).) On September 19, 2005, Kraft emailed Vaughan indicating that he received the amended Schedule B and asking Vaughan to explain why exceptions were added after the closing; Vaughan never responded to this email. (Pl. SOF ¶¶ 15–16.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2515. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See id.*, 477 U.S. at

255, 106 S. Ct. at 2513. Furthermore, "the substantive law will identify which facts are material," *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510, and in this case, the parties agree that Georgia law applies to this dispute.

**ANALYSIS**

The parties' briefs raise two disputed issues: (1) Did Wilmington purchase all 19.846 acres in fee simple, or did Wilmington purchase only the nine pad sites in fee simple, along with an undivided common interest in the 19.846 acres? and (2) Were the Declaration and the units conveyed pursuant to it properly excepted from coverage under the Title Policy, or were they added as exceptions after the fact? As the answer to the second question is dispositive, we need not address the former.

**1. Exceptions to the Title Policy**

Title insurance generally protects the insured against any defects in or encumbrances on title which are in existence at the time that the insured takes title. *Glass*, 354 S.E.2d at 189. The purpose of Schedule B in a title insurance policy, however, is to identify matters affecting the insured property that will be excepted from coverage. "An exception is an uninsured interest in a title, lien, or other insured property. . . . Exceptions carve out areas from subjects otherwise covered: they are the holes in the Swiss cheese." Burke, *Law of Title Insurance* § 9.04 (2011).

The Title Policy provided by Fidelity protects Wilmington against loss or damages incurred by reason of "(1) Title to the estate . . . being vested other than as stated therein; (2) Any defect in or lien or encumbrance on the title; (3) Unmarketability of the title; (4) Lack of a right of access to and from the land." (Title Policy at 1.) Schedule B of the final Title Policy issued by Fidelity reads as follows:

> This policy does not insure against loss or damage (and the Company will not pay costs, attorney's fees or expenses) which arise by reason of: . . .
>
> 2. Declaration of Condominium recorded in Deed Book 243-V, page 688, Chatham County, Georgia Records, as supplemented and amended. . . .
>
> 11. All units, rights, interests and common grounds previously conveyed pursuant to the Declaration of Condominium recorded in Deed Book 243-V, page 688, Chatham County, GA public records.

(*Id*., Schedule B.)

"An insurance contract is governed by the ordinary rules of construction and should be construed to ascertain the intention of the parties." *Progressive Preferred Ins. Co. v. Brown,* 413 S.E.2d 430*,* 431 (Ga. 1992) (citing *Golden v. Nat'l Life & Accident Ins. Co.,* 5 S.E.2d 198, 199 (Ga. 1939); OCGA § 13-2-3 (1982)). The plain meaning of the language quoted above excepts damages that arise by reason of the Declaration and units conveyed pursuant to it. However, according to Wilmington's pleadings, it does not have fee simple interest because of the restrictions in the Declaration and the prior transfers of 24 condominium units. (Compl. ¶¶ 21–30; Opp'n at 10–11.) In other words, the alleged defects for which Wilmington seeks to recover from Fidelity arise by reason of the Declaration and the units conveyed pursuant to it.[2] Thus, the only question is whether Schedule B was properly included in the Title Policy or was added after the closing. Based on the facts presented in the parties' Local Rule 56.1 statements, we find that Schedule B was properly included in the Title Policy.

First, there is no dispute that "Protective Covenants recorded in Deed Book 243-V, page 688" were included as an exception in the July 26 Title Commitment. (July 26 Title Commitment at 6.) Wilmington argues that such exception does not include the Declaration, as

---

[2] Contrary to Wilmington's assertion, the Title Policy was not worthless as it would have covered other, non-excepted defects in title.

the description "Protective Covenant" is a generic term that usually refers to an interest to a third party of some sort or any type of covenant that has been granted and impacts title. (Pl. Resp. to Def. SOF ¶ 19.) Furthermore, Wilmington explains, the book and page reference contained therein would not have indicated what type of protective covenant was being excepted until the document was provided. (*Id*.) However, if Wilmington had searched the book and page record provided, it would have discovered that it referenced the Declaration. Moreover, the cover page drafted by Vaughan and sent with the July 26 Title Commitment states, "I am sending all exception copies except covenants. They are lengthy. If you need them, please call me." (Compl. Ex. C).[3] Therefore, even drawing all inferences in favor of Wilmington, we find that it was on notice that the Declaration would be excepted from the Title Policy as early as July 26, 2005. *C.f. Security Union Title Ins. Co. v. RC Acres, Inc.,* 604 S.E.2d 547, 550 (Ga. App. 2004) ("The recording of a deed gives constructive notice of the ownership of the legally described property and any encumbrances to the property." (citing *Gardner v. Granniss*, 57 Ga. 539, 557(10) (1876))); *Id.* ("When an easement is properly recorded of public record, the world has constructive notice of such easement whether or not they have actual notice." (citing OCGA § 15-6-67(b)(4)(F); *Chatham v. Bradford*, 50 Ga. 327 (1873); *McElwaney v. MacDiarmid*, 62 S.E. 20, 21 (Ga. 1908))); O.C.G.A. § 23-1-17 (explaining that in equity, "[n]otice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found that such inquiry might have led. Ignorance of a fact due to negligence shall be equivalent to knowledge in fixing the rights of parties").

---

[3] There is some evidence that Wilmington did call and received a copy of the Declaration that same day. (Def. Resp. to Pl. SOF ¶ 48.)

Second, the Revised Title Commitment includes as exceptions to title both the Declaration and units conveyed pursuant to it. Thus if the Revised Title Commitment was sent to Wilmington, both key exceptions were properly included prior to closing. According to Fidelity's Local Rule 56.1 Statement, "On July 27, 2005, a revised title commitment was sent to Wilmington, via their counsel." (Def. SOF ¶ 20.) Wilmington denies this statement: "Denied. Defendant has admitted that there were no revisions to the title commitment after July 26, 2005." (Pl. Resp. to Def. SOF ¶ 20 (citing Fidelity's Resp. to Pl.'s First Set of Interrogatories No. 3 (hereinafter Inter. No. 3)).) However, Interrogatory Number 3, and Fidelity's answer to it clearly refer to the "title insurance policy" not the "title commitment":

> [Question 3:] Identify each revision to the title insurance policy described in Question 2 above[4] . . .
>
> Response: "[Fidelity] objects to this interrogatory as phrased is argumentative as it requires [Fidelity] to adopt the assumption there were revisisons to the title insurance policy described in Question 2, above. [Fidelity] is not presently aware of such revisions. Discovery is ongoing, as [Fidelity] attempts to locate any file in its possession, custody or control to show that any such revisions to the title insurance policy exist."

(Inter. No. 3.) Importantly, a title commitment and title policy are unique documents; as explained by the July 26 Title Commitment, a title commitment is "preliminary to the issuance of such policy or policies of title insurance." (July 26 Title Commitment at 2.) While Wilmington clearly intended to reference the July 26 Title Commitment, the answer clearly refers only to revisions of the Title Policy. This response could fairly be read as unresponsive, but it cannot be

---

[4] Question 2 refers to the "title insurance policy . . . which was faxed to Plaintiff on July 26, 2005, a copy of which Plaintiff attached to its Complaint as Exhibit C."

read as an admission by Fidelity that there were no revisions to the July 26 Title Commitment. Under Federal Rule of Evidence 56:

> [a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civil P. 56(c). Further, "if a party fails to properly address another party's assertion of fact as required . . . the court may . . . consider the fact undisputed for purposes of the motion." *Id*. at 56(e). As Wilmington has neither cited to material in the record that supports its denial, nor discredited Fidelity's citation, we find that its denial of this material fact is improper, and we consider the fact undisputed for purposes of this motion.

If we, nonetheless, expand our search and look to other evidence properly in the record, we reach the same conclusion that Fidelity sent the Revised Title Commitment to Wilmington's attorneys on July 27, 2005. *See* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). In support of its motion for summary judgment, Fidelity has submitted an affidavit indicating that there were multiple revisions of the July 26 Title Commitment. (Vaughan Aff. ¶ 3.) It also has produced the cover page that was faxed to Mr. Charles Robbins, attorney for Wilmington. The cover letter indicates that the Revised Title Commitment is attached and "[w]e also need to except the condominium transactions and sales which have already conveyed out." (Revised Title Commitment, Cover Page.)

Wilmington, on the other hand, does not present any evidence that directly contradicts Fidelity's assertion that the Revised Title Commitment was sent. Rather, it explains that "Mr.

Kraft had not been provided a title commitment with a Schedule B of exceptions to title as it appeared in the Owner's Policy he received in September 2005," and "When Mr. Kraft reviewed [the Title] Policy, it listed exceptions to title that he had never seen before." (Pl. SOF ¶¶ 12, 14 (citing Kraft Aff. ¶¶ 8, 14).) Yet, these statements can be true and not contradict Fidelity's assertion that the Revised Title Commitment was sent on July 27, 2005. First, Schedule B from the Revised Title Commitment and Schedule B of the Title Policy are different—presumably because various concerns had been addressed and removed from the list of exceptions. (*Compare* Revised Title Commitment, Schedule B-II (listing 17 exceptions), *with* Title Policy, Schedule B (listing 13 exceptions).) Second, it is not dispositive that Mr. Kraft had not previously read the exception on Schedule B of the Title Policy as the relevant question is whether it was sent, not whether he had knowledge of it. Therefore, Mr. Kraft's assertions, without more, are not sufficient to refute the statement of material fact proposed by Fidelity.

Similarly, the record indicates that Wilmington should have been aware of the previous conveyances and the restrictions on title. Wilmington admits that it was assigned Foster's rights in the quiet title action brought by the condominium owners prior to closing on the property. (*See* Def. SOF ¶¶ 17–18.) Moreover, the alleged restrictions on title were not hidden. The Warranty Deed specifically references "restrictions of record;" the Purchase and Sale agreement also excepts "restrictions . . . recorded in the public record." (Warranty Deed at 2; Purchase and Sale Agreement, Ex. F.) Wilmington does not deny that its agents received these documents prior to closing. The restrictions in the Declaration and the units conveyed pursuant to the Declaration were also duly recorded, and as such Wilmington is deemed to have constructive notice of them. *Security Union Title Ins. Co. v. RC Acres, Inc.,* 604 S.E.2d 547, 501 (Ga. App.

2004) ("When an easement is properly recorded of public record, the world has constructive notice of such easement whether or not they have actual notice." (citing OCGA § 15-6-67(b)(4)(F))); *Leeds Bldg. Products, Inc. v. Sears Mortg. Corp.,* 477 S.E.2d 565, 566–67 (Ga. 1996) ("We hold that a security deed . . . once filed, provides constructive notice to subsequent bona fide purchasers."). In sum, Wilmington has failed to present any facts that question whether the Revised Title Commitment was sent on July 27, 2005. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. We therefore find that there is no triable question of fact regarding whether the Revised Title Commitment containing the two key exceptions was sent to Wilmington on July 27, 2005. As the language of the exceptions clearly excludes from coverage the type of damages alleged in the current complaint, there is no genuine issue for trial, and we grant Fidelity's motion for summary judgment.

**2. Wilmington's additional arguments**

Finally, we briefly address Wilmington's contention that Fidelity breached the contract by not following the title commitment standards imposed under Georgia law. (Opp'n at 8–9.) Wilmington explains, and Fidelity concedes, that Fidelity authorized and engaged Vaughan to act as its agent for purposes of issuing an owner's policy of title insurance in conformity with the law of the state of Georgia. (Pl. SOF ¶ 24; Def. Resp. to Pl. SOF ¶ 24.) Wilmington argues that Vaughan failed to disclose a defect in the Declaration. (Opp'n at 6.) This failure, it alleges, occurred in the Title Opinion Letter Vaughan sent to Wilmington's lender, AmSouth Bank. (*See* August 2, 2005 letter to AmSouth Bank at 2.) The letter, however, includes express language

prohibiting any third party from relying on the opinions stated therein: "This opinion may not be . . . relied upon by any other person." (*Id*. at 3.) Moreover, Wilmington's argument alleges a violation of the Georgia Land Titles Standards. (Opp'n at 6.) These standards, however, impose a "duty to inform [the] *client* of certificate exceptions that can be insured over by title insurers." Georgia Land Title Standards § 24.2 (emphasis added). As the letter was drafted for AmSouth, Wilmington was not Vaughan's clients; thus, on its face, this standard does not constitute a breach of contract.[5]

Separately, as mentioned above, Wilmington disputes that, at the closing, it received a fee simple title in any of the 19.846 acres. (Pl. Resp. to Def. SOF ¶ 1.) Wilmington argues that it acquired such title only after litigation with the condominium owners and subsequent amendment to the Declaration. While significant portions of the briefs are spent arguing this issue, we believe that the dispute is not relevant, and we do not resolve it here. Wilmington's assertion is that the Declaration was drafted in such a manner that no land was reserved for future development. (Opp'n at 6.) Specifically, it argues that "the declaration contained a clear title defect that was not disclosed to Wilmington." (*Id*. at 8.) However, as decided above, the Declaration and any loses or damages that arise by reason of it were properly excepted from coverage. Therefore, a defect in the Declaration cannot be a ground for a breach of contract claim. Fidelity did not guarantee that the wording of the Declaration would be perfect, or that it would conform to Wilmington's expectation of what the Declaration should say.

---

[5] This argument is also unpersuasive because "[a] title standard is a statement officially approved by a bar association . . . It is not a law, but gains its effect from voluntary compliance by attorneys." Georgia Land Title Standards, Preface.

**CONCLUSION**

For the reasons set forth above, we find that there are no material facts in dispute and that Fidelity is entitled to judgment as a matter of law.[6] We grant Fidelity's motion for summary judgment. It is so ordered.

                                                                                                  Marvin E. Aspen
                                                                                                  United States District Judge

Dated:        Chicago, Illinois
                 June 12, 2012

---

[6] Though this opinion addresses only the contract claim, we grant summary judgment on the equitable estoppel claim as well. *See Wilson v. Keheley & Co., Inc.*, 341 S.E.2d 245, 246 (Ga. App. 1986) ("Without some proper legal cause of action, establishing all the elements of equitable estoppel will not entitle plaintiff to relief." (citing *Sabin Meyer Reg'l Sales Corp. v. Citizens Bank*, 502 F. Supp. 557, 560 (N.D. Ga. 1980))).